UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WESCOTT ELECTRIC COMPANY<br>   Plaintiff | )<br>)<br>) | Civil Case No. 2:17-cv-04718-GEKP |
| v. | )<br>) | |
| CINCINNATI INSURANCE COMPANY, a/k/a<br>CINCINNATI CASUALTY COMPANY<br>   Defendant | )<br>)<br>) | |

## AMENDED CIVIL ACTION COMPLAINT

Plaintiff, Wescott Electric Company, by and through its undersigned counsel, demands judgment against defendant Cincinnati Insurance Company a/k/a Cincinnati Casualty Company, upon the following causes of action and averments:

1. Plaintiff, Wescott Electric Company ("Wescott"), is a corporation duly organized and existing and licensed in the Commonwealth of Pennsylvania and maintains its principal place of business at the address set forth above.

2. Defendant, Cincinnati Insurance Company a/k/a Cincinnati Casualty Company ("Cincinnati"), is a corporation or other similar corporate entity duly organized and existing and licensed to issue policies of insurance in the State of Ohio which maintains its principal place of business at the address set forth above.

3. Many of the events which are the subject of this litigation took place in the City and County of Philadelphia.

4. Cincinnati regularly conducts business in the City and County of Philadelphia.

5. On or about December 31, 2004, Cincinnati, in its regular course of business, issued to Wescott a policy of commercial insurance, Policy No. CPP 091 44 23, including, inter

alia, commercial crime coverage (the "2004 Policy"). A true and correct copy of pertinent portions of the 2004 Policy in effect from December 31, 2004 to December 31, 2007 are attached hereto as Exhibit "A".

6. The 2004 Policy was renewed or replaced under Policy number CPP 082 48 61 for a period from December 31, 2007 to December 31, 2010 (the "2007 Policy"), then again under policy number CPP 106 87 52 for a period from January 31, 2010 to January 31, 2013 (the "2010 Policy"), and finally under policy number EPP 017 21 82 from January 31, 2013 to January 31, 2016 (the "2013 Policy"). Pertinent portions of the 2007 Policy, the 2010 Policy and the 2013 Policy are attached hereto as Exhibits "B", "C", and "D", respectively. Upon information and belief, a separate premium was paid each year by Wescott and these policies were renewed on an annual basis.

7. At all times material hereto, Cincinnati was acting either individually or through its duly authorized agents, servants, workmen or employees, who were acting within the course and scope of their employment and on the business of Cincinnati.

8. Former Wescott employee James Bryan ("Bryan") stole at least $2,885,931.50[1] from Wescott during the period from 2003 through 2013.

9. Bryan participated in two separate and unrelated schemes to defraud Wescott. Initially, from 2003 through 2011, he fraudulently issued checks made out to businesses on jobs that did not exist. Later, he intercepted the checks and cashed them at check cashing facilities located in Philadelphia and elsewhere. The total amount involved in connection with the check fraud was $2,182,638.27. However, the amount involved in the check fraud scheme after December 31, 2004 (when the 2004 Policy commenced) was $2,009,760.42.

---

[1] A small amount of money was recovered from the total thefts of $2,919,361.50.

10. In 2012, Bryan commenced a new scheme to defraud Wescott. In the new scheme, he took copper wire from Wescott which was supposed to be used on various projects and then sold the copper wire (almost 100 tons) for scrap at Accurate Metals, located in Lansdowne, PA, or at other locations. The value of the stolen wire was $736,723.23. An itemization of the frauds by year is as follows:

| Year | Total Fraud | Fraud Type |
| --- | --- | --- |
| 2005 | $ 142,357.54 | Check fraud |
| 2006 | $ 13,718.48 | Check fraud |
| 2007 | $ 236,960.79 | Check fraud |
| 2008 | $ 489,165.14 | Check fraud |
| 2009 | $ 415,949.32 | Check fraud |
| 2010 | $ 538,841.07 | Check fraud |
| 2011 | $ 172,768.18 | Check fraud |
| 2012 | $ 326,467.25 | Stolen wire |
| 2013 | $ 410,255.98 | Stolen wire |
| | $2,746,483.65 | |

11. After Wescott discovered Bryan's thefts on or about July 1, 2013, the matter was referred to the Delaware County District Attorney's office, which investigated the events and charged Bryan with various felony offenses.

12. Wescott promptly reported the thefts to Cincinnati and fully cooperated in Cincinnati's investigation.

13. Thereafter, in 2016, following an extensive investigation, Wescott submitted a Proof of Loss (Employee Theft) to Cincinnati ("Proof of Loss"). A true and correct copy of the Proof of Loss (with accompanying Detailed Statement of Claim/Description of Occurrences) is attached hereto as Exhibit "E". Wescott does not have a copy of the signed and notarized Proof of Loss in its possession. The Proof of Loss provides specific detail of the check dates, amounts, check numbers, payees, and endorsements. There were hundreds of checks and thefts of copper wire at issue.

3

14. On or about February 18, 2014, Bryan pleaded guilty to five felony counts of forgery and one felony count of theft by unlawful taking in the Court of Common Pleas of Delaware County and was sentenced to imprisonment.

15. In September, 2016, Cincinnati paid $100,000.00 to Wescott based on Cincinnati's conclusion that the available coverage limit for the 2013 Policy was $100,000.00 "for all claims 'discovered' within the policy period that are attributable to one 'occurrence'. The coverage is not cumulative from year to year or each policy period." The check was accepted without prejudice to Wescott to assert any additional claims that might be applicable. A copy of the check and Cincinnati's September 22, 2016 cover letter is attached hereto as Exhibit "F".

16. However, there was more than one "occurrence" under the Policy involved in this unfortunate situation. Therefore, Westcott requested additional coverage to compensate it for the overwhelming loss caused by Bryan's criminal conduct.

17. In pertinent part, the 2013 Policy reads as follows:

    A. **Insurance Agreements**

        Coverage is provided under the following Insuring Agreements for which a Limit of Insurance is shown in the Declarations and applies to loss that you sustained resulting directly from an "occurrence" taking place at any time which is "discovered" by you during the Policy Period shown in the Declarations or during the period of time provided in the Extended Period to Discover Loss Condition E.1.(g):

        1. Employee Theft

        We will pay for loss of or damage to "money", "securities", and "other property" resulting directly from "theft" committed by an "employee", whether identified or not, acting alone or in collusion with other persons. For the purposes of this insuring agreement, "theft" shall also include forgery.

        \* \* \*

> B. **Limit of Insurance:**
>
> The most we will pay for all loss resulting directly from an "occurrence" is the applicable Limit of Insurance shown in the Declarations.
>
> If any loss is covered under more than one Insuring Agreement or Coverage, the most we will pay for such loss shall not exceed the largest Limit of Insurance available under any one of those Insuring Agreements or Coverages.

Under the Definitions in the Policy:

> 4. "Discover" or "discovered" means the time when you first became aware of facts which would cause a reasonable person to assume that a loss of a type covered by this insurance has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known.

See Exhibit "D", specifically CR 00 20 05 06, pp. 1, 2, 10.

    18.    Cincinnati relied upon the following definition of "occurrence" in its September 22, 2016 letter:

> 14. "Occurrence" means:
>
> a. Under Insurance Agreement A.1.:
>
> (1) An individual act;
>
> (2) The combined total of all separate acts whether or not related; or
>
> (3) A series of acts whether or not related;
>
> Committed by an "employee" acting alone or inclusion with other persons, during the Policy Period shown in the Declarations, before such Policy Period or both.

See Exhibit "D", CR 00 20 05 06, p. 12 of 13, and Exhibit "F".

19. However, the correct definition of "Occurrence" is defined in Special Per Occurrence Deductible Endorsement (the "Endorsement")[2] as "all loss, damage, or a sequence of loss or damage, casualties or disasters arising from a single happening or event." See Exhibit "A" (section IA4006 07 10), Exhibit "B" (section 4006 04 04), Exhibit "C" (section 4006 09 07) and Exhibit "D" (section 4006 07 10).

20. Here, there were numerous separate and distinct "occurrences" which triggered coverage as detailed in Exhibit "E". The Proof of Loss details each separate and distinct incident of check fraud, each of which ranged from almost $1,000.00 to a little over $10,000.00 per week. The theft of copper wire is a completely separate and distinct act from forging checks. Thus, theft of copper wire and forging checks should be considered separate "occurrences" under the Policy.

21. Although Section A of the 2013 Policy (Insuring Agreement) states that "[c]overage is provided under the following Insuring Agreements for which a Limit of Insurance is shown in the Declarations and applies to loss that you sustain resulting directly from an "occurrence" taking place at any time which is "discovered" by you during the Policy Period shown in the Declarations or during the period of time provided in the Extended Period to

---

[2] The language of the Endorsement states
This endorsement modifies insurance provided under the following:
* * *
CRIME AND FIDELITY COVERAGE PART
* * *
A. Special Per Occurrence Deductible ... 2. This endorsement does not apply to any of the forms listed in Paragraphs a. and b.:
    a ... Commercial Crime Coverage Form, A. Insurance Agreements,
        1. Employee Theft, 2. Forgery or Alteration, 6. Computer Fraud and 7. Funds Transfer Fraud
* * *
    b. Definition
        For the purpose of this endorsement only, any definition of "occurrence" is deleted in its entirety and the following definition is added to:
* * *
        3. COMMERCIAL CRIME COVERAGE FORM.
* * *
"Occurrence" means all loss, damage, or a sequence of loss or damage, casualties or disasters arising from a single happening or event.

6

Discover Loss Condition E.1.g", there should be coverage for each of the prior years of insurance policies issued by Cincinnati as separate thefts occurred each year during 2005-2013. Wescott paid a separate payment for each Policy, and is entitled to recover under each of those policies as well.

    22.    The 2004 Policy also states:

> 8. **Loss Sustained During Prior Insurance**:
>
> > (a) If you, or any predecessor in interest, sustain loss during the period of any prior insurance that you or the predecessor in interest could have recovered under that insurance except at the time within which to discovery loss that expired, we will pay for it under this coverage, provided
> >
> > > (1) This insurance became effective at the time of cancellation or termination of the prior insurance; and
> > >
> > > (2) The loss would have been covered by this insurance had it been in effect when the acts or events causing the loss were committed or occurred:
> >
> > (b) The insurance under this Condition is part of, not in addition to, the Limits of Insurance applying to this insurance and is limited to the lesser of the amount recoverable under:
> >
> > > (1) This insurance as of its effective date; or
> > >
> > > (2) The prior insurance had remained in effect.
>
> 9. **Loss Covered Under this Insurance and Prior Insurance Issued by Us or Any Affiliate**:
>
> > If any loss is covered:
> >
> > > (a) Partly by this insurance; and
> > >
> > > (b) Partly by any prior cancelled or terminated insurance that we or any affiliate had issued to you or any predecessor in interest;
> > >     The most we will pay is the larger of the amount recoverable under this insurance or the prior insurance.

    10.    **Non-Cumulation of Limit of Insurance.**

> Regardless of the number of years this insurance remains in force or the number of premiums paid, no Limit of Insurance accumulates from year to year or period to period.

The language is identical in the 2007 Policy.

    23.    The 2010 Policy and the 2013 Policy have different language regarding insurance.

Section B Limit of Insurance, reads as follows:

> The most we will pay for all loss resulting directly from an "occurrence" is the applicable Limit of Insurance shown in the Declarations.
>
> If any loss is covered under more than one Insuring Agreement or Coverage, the most we will pay for such loss shall not exceed the Largest limit of Insurance available under anyone of those Insuring Agreements or Coverages.
>
> Condition, Section (g), Extended Period to Discover Loss, reads as follows:
>
> We will pay for loss that you sustained prior to the effective date of cancellation of this insurance, which is "discovered" by you:
>
>> (1) No later than sixty days from the date of that cancellation. However, this extended period to "discover" loss terminates immediately upon the effective date of any other insurance obtained by you, whether from us or another insurer, replacing in whole or in part the coverage afforded under this insurance, whether or not such other insurance provides coverage for loss sustained prior to its effective date.
>
> Condition, Section (m), Policy Bridge - Discovery Replacement Loss Sustained, reads as follows:
>
>> (1)    If this insurance replaces insurance that provided you with an extended period of time after cancellation in which to discover loss and which did not terminate at the time this insurance became effective:
>>
>>> (a) We will not pay for any loss that occurred during the Policy Period of that prior insurance which is "discovered" by you during the extended period to "discover" loss, unless the amount of loss extends the Limit of Insurance and Deductible Amount of that prior insurance. In that

8

case, we will pay for the excess loss subject to the terms and conditions of this policy.

(b)     However, any payment we make for the excess loss will not be greater than the difference between the Limit of Insurance and Deductible Amount of that prior insurance and the Limit of Insurance shown in the Declarations. We will not apply the Deductible Amount shown in the Declarations to this excess loss.

24.     At a minimum, there were at least two separate occurrences for the copper wire theft and the check forgery, which require a payment of $100,000.00 for each occurrence by Cincinnati, not a total of $100,000.00 for all acts, as claimed by Cincinnati.

25.     Moreover, since the criminal acts occurred over the course of several years, there should be separate coverage of $100,000.00 per year for each year that Cincinnati's policies were in effect. The 2004 Policy, the 2007 Policy, and the 2010 Policy each have a $100,000.00 limit on coverage per occurrence.

26.     Under one possible reading of the policies issued by Cincinnati, all of the check fraud or stolen wire purchases in each given year could constitute one occurrence. Accordingly, there should be additional coverage for 2005 through 2013, each with a limit of $100,000.00. Since the thefts in 2006 were less than $100,000.00, the total amount for 2006 should be $13,718.38.

27.     In addition, Wescott should be entitled to recover the policy limits of $100,000.00 for 2005, 2007, 2008, 2009, 2010, 2011, and 2012, an additional $700,000.00.

28.     Thus, Wescott's total claim is as follows:

| | |
|---|---|
| 2013 - for the second occurrence *vis a vis* check fraud and wire theft | $100,000.00 |
| 2012 - for the wire theft and check fraud | $200,000.00 |
| 2011 - check fraud | $100,000.00 |
| 2010 - check fraud | $100,000.00 |
| 2009 - check fraud | $100,000.00 |
| 2008 - check fraud | $100,000.00 |

9

| | |
|---|---:|
| 2007 - check fraud | $100,000.00 |
| 2006 - check fraud | $ 13,718.38 |
| 2005 - check fraud | $100,000.00 |
| Total | $913,718.38 |

29. Alternatively, each instance of theft, whether by check or stealing copper wire, could constitute separate "occurrences" under the applicable policies, meaning that there would be available coverage of $2,746,483.65. Since $100,000.00 has been paid, the remaining coverage would be $2,646,483.65.

30. Alternatively, since Bryan pleaded guilty to six separate criminal acts, each criminal act would be considered a separate "occurrence" with $100,000.00 of coverage, with $500,000.00 remaining to be paid.

31. The theft of such a substantial amount from a small family owned company such as Wescott was devastating.

32. From 2005 through 2013, while the policies of insurance were in full force and effect, Wescott suffered a series of thefts.

33. Notice of Wescott's covered loss was given to Cincinnati in a prompt and timely manner and Wescott has done and otherwise performed all things required of it under the Policy of insurance issued by Cincinnati, including cooperating with Cincinnati's investigation (if any); mitigating damages where reasonable, required and/or possible; providing Cincinnati with all available information and complying with all conditions precedent.

34. Cincinnati, despite demand for benefits under its policies of insurance, has failed and refused to pay to Wescott those benefits due and owing under said policies of insurance other than $100,000.00.

35.     Solely as a result of Cincinnati's failure and refusal to pay benefits to Wescott as required under the aforementioned Policy of insurance, Wescott has suffered loss and damage in an amount in excess of Fifty Thousand Dollars ($50,000.00).

## COUNT I - BREACH OF CONTRACT

36.     Wescott incorporates by reference herein the facts and allegations contained in the preceding paragraphs as though same were set forth herein at length.

37.     Cincinnati has breached its contractual obligations to pay benefits to Wescott for a loss covered under Cincinnati's Policy of insurance.

WHEREFORE, Plaintiff Wescott Electric Company demands judgment against Defendant, Cincinnati Insurance Company a/k/a Cincinnati Casualty Company, in an amount in excess of Fifty Thousand Dollars ($50,000.00) together with interest and costs.

**DEAN E. WEISGOLD, P.C.**

By: _____
Dean E. Weisgold, Esquire
Attorney for Plaintiff Wescott Electric Company

## VERIFICATION

James P. Wescott, President, says, subject to the penalties of 18 Pa.C.S. Section 4904 relating to unsworn falsification to authorities, that he is an adult individual and the President of plaintiff in the above matter and that the facts set forth in the foregoing Amended Complaint are true and correct to the best of his knowledge, information and belief.

Date: 11/10/2017

_____
James P. Wescott, President

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WESCOTT ELECTRIC COMPANY<br>    Plaintiff | )<br>)<br>) | Civil Case No. 2:17-cv-04718-GEKP |
| v. | )<br>) | |
| CINCINNATI INSURANCE COMPANY, a/k/a<br>CINCINNATI CASUALTY COMPANY<br>    Defendant | )<br>)<br>) | |

### CERTIFICATE OF SERVICE

I, Dean E. Weisgold, Esquire, hereby certify that a true and correct copy of the within Amended Complaint has been served upon counsel listed below on this 20th day of November, 2017 by ECF.

>Amy E. Bentz, Esquire
>Bentz Law Firm, PC
>The Washington Center Building
>680 Washington Road, Suite 200
>Pittsburgh, PA 15228

>DEAN E. WEISGOLD, P.C.
>
>By: /s/ Dean Weisgold
>Dean E. Weisgold, Esquire

Dated: November 20, 2017