IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WESCOTT ELECTRIC COMPANY, | : | |
| *Plaintiff*, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CINCINNATI INSURANCE COMPANY, | : | No. 17-4718 |
| *Defendant*. | : | |

**M E M O R A N D U M**

PRATTER, J.                                                                                                                       MARCH 8, 2018

## INTRODUCTION

This disheartening story of prolonged and significant employee theft presents a straightforward case of contract construction where the plain language of the insurance policy dictates the result.

Over the course of ten years, an employee of the Wescott Electric Company stole nearly $3 million from Wescott. During that time, Wescott had four consecutive insurance policies issued by the Cincinnati Insurance Company. Wescott discovered the theft during the policy period of the fourth insurance policy, and Cincinnati paid the policy limit of $100,000 for a single "occurrence" of employee theft.

Unsatisfied with its payout, Wescott brought this suit against Cincinnati, arguing (1) that it is entitled to coverage not only under the fourth policy, but also under the third policy; and (2) that the employee's theft constituted more than one "occurrence" under either policy. Cincinnati filed this motion to dismiss.

As to Wescott's first argument, as discussed in greater detail below, the third policy covered only those losses discovered "during the Policy Period," and the third policy period

1

ended five months before Wescott discovered the theft. Therefore, the Court concludes that the third policy does not provide coverage for Wescott's loss; only the fourth policy does. As to the second argument, again, as discussed below, the fourth policy defines one "occurrence" of employee theft as "[a] series of acts whether or not related." Therefore, the employee theft in this case constituted only one "occurrence."

Cincinnati's motion to dismiss is therefore granted.

## FACTS

### I. The Theft

James Bryan, an employee of Wescott, stole nearly $3 million from the company between 2003 and 2013. The theft was in bits and pieces, with Mr. Bryan stealing a few hundred thousand dollars each year. During the last year of the scheme — the only period at issue in this case — Mr. Bryan stole $700,000 worth of copper wire, which he sold for scrap.

### II. The Insurance Policies

During the ten-year period of the theft, Wescott had four consecutive insurance policies with Cincinnati. Each policy lasted for three years, and the parties refer to each policy by the year it took effect. The 2004 Policy and the 2007 Policy contain substantially the same language. The 2010 Policy and the 2013 Policy are also substantially the same.

All four are discovery-based policies, meaning that coverage depends on when Wescott discovered a given loss. However, the two sets of policies provide different discovery windows: the 2004 and 2007 Policies provide coverage for any loss discovered *up to a year after* the policy period, but the 2010 and 2013 Policies require a loss to be discovered *during* the policy period.

### A. *2004 Policy and 2007 Policy*

The 2004 Policy and the 2007 Policy provide coverage for losses discovered up to a year after the policy period: "[Cincinnati] will pay only for covered loss discovered no later than one year from the end of the policy period." Am. Compl. Ex. A, Ex. B.

Wescott does not claim coverage under these policies, both of which ended well over a year before Wescott's 2013 discovery of Mr. Bryan's theft. However, as explained below, these policies are still relevant only because Wescott argues that the Court should reform the 2010 Policy to include the one-year discovery window found in the 2004 and 2007 Policies.

### B. *2010 Policy and 2013 Policy*

The 2010 Policy and the 2013 Policy each provide coverage for $100,000 per "occurrence" of employee theft. In the two provisions most important for this case, the policies (1) require that any loss be discovered during the policy period, and (2) define "occurrence" broadly.

#### 1. Discovery Window

Unlike the one-year discovery window in the 2004 and 2007 Policies, both the 2010 and 2013 Policies require that any loss be discovered during the policy period. Specifically:

> Coverage is provided . . . for which a Limit of Insurance is [$100,000] and applies to loss that you sustain resulting directly from an "occurrence" taking place at any time **which is "discovered" by you during the Policy Period** . . . .

*See* Am. Compl. Ex. C, Ex. D (emphasis added). The policy period (and, therefore, the time to discover a loss) for the 2010 Policy was January 31, 2010 to January 31, 2013. The policy period for the 2013 Policy was January 31, 2013 to January 31, 2016. Wescott discovered the theft on July 1, 2013 — after the end of the 2010 Policy.

3

### 2. Definition of Occurrence

Both policies define an "occurrence" of employee theft broadly:

> 14. "Occurrence" means:
>
> . . .
>
> > (1) An individual act;
> > (2) The combined total of all separate acts whether or not related; or
> > (3) A series of acts whether or not related;
>
> committed by an "employee" acting alone or in collusion with other persons, during the Policy Period shown in the Declarations, before such Policy Period or both.

### III. The Current Coverage Dispute

Once Wescott discovered the theft in July 2013, it informed Cincinnati. Although Wescott initially argued that it was entitled to greater coverage, it now claims coverage only for losses from the final year of Mr. Bryan's theft — in other words, for the theft that occurred during the last seven months of the 2010 Policy and the first five months of the 2013 Policy. That final year breaks down as follows: Mr. Bryan stole over $300,000 from July 2012 to January 31, 2013 (the last day of the 2010 Policy), and he stole roughly the same amount from February 1, 2013 (the first day of the 2013 Policy) to July 1, 2013.

Cincinnati paid Wescott only $100,000, the limit for one "occurrence" of employee theft under the 2013 Policy.

### PROCEDURAL POSTURE

In August 2017, Wescott brought a claim for a single count for breach of contract against Cincinnati in state court. Cincinnati removed to this Court in October 2017. In December, after Wescott filed an amended complaint, Cincinnati filed this motion to dismiss.

## STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint. To survive a motion to dismiss, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Specifically, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The question is not whether the claimant "will ultimately prevail . . . but whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011) (citation and internal quotation marks omitted).

In evaluating the sufficiency of a complaint, the Court adheres to certain well-recognized parameters. For one, the Court "must consider only those facts alleged in the complaint and accept all of the allegations as true." *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994). Also, the Court must accept as true all reasonable inferences emanating from the allegations, and view those facts and inferences in the light most favorable to the nonmoving party. *See Revell v. Port Auth.*, 598 F.3d 128, 134 (3d Cir. 2010).

That admonition does not demand that the Court ignore or even discount reality. "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 678. If a claim "is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." *Phillips v. County of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008).

## ANALYSIS

Wescott is entitled to coverage for a single "occurrence" of employee theft under only the 2013 Policy. The Court reaches this conclusion in two steps. First, only the 2013 Policy provides coverage because the theft was not discovered until after the 2010 Policy ended. Second, under the 2013 Policy, only one "occurrence" of employee theft has transpired.

**I. Only the 2013 Policy provides coverage.**

Of the four insurance policies involved in this case, only the 2013 Policy provides coverage. In this section, the Court's analysis proceeds by process of elimination: the 2004, 2007, and 2010 Policies do not provide coverage.

*A. The 2004 and 2007 Policies do not provide coverage.*

Wescott concedes that the 2004 and 2007 Policies cannot provide coverage. *See* Resp. to Mot. Dismiss ¶ 6. Both of these policies stated that Cincinnati "will pay only for covered loss discovered no later than one year from the end of the policy period." The policies ended in 2007 and 2010, respectively, and the theft was not discovered until 2013.

*B. The 2010 Policy does not provide coverage.*

The plain text of the 2010 Policy precludes coverage of losses discovered after the close of the policy period, and the policy should not be reformed to include the larger discovery windows expressly present in the 2004 and 2007 Policies.

**1. The plain text of the 2010 Policy precludes coverage.**

The 2010 Policy applies only to loss "which is 'discovered' by [Wescott] during the Policy Period." Am. Compl. Ex. C. The policy period ended on January 31, 2013, but the theft was not discovered until July 1, 2013. By the plain language of the contract, the theft was discovered 5 months too late for the 2010 Policy to provide coverage.

### 2. The 2010 Policy should not be rewritten to cover the theft.

Wescott seeks to avoid this straightforward rule by arguing that the Court should rewrite the 2010 Policy to include the larger, one-year discovery window found in the 2004 and 2007 Policies: "[Cincinnati] will pay only for covered loss discovered no later than one year from the end of the policy period." If the 2010 Policy had included this one-year discovery window, then it would have covered the theft, which was discovered only five months after the end of the 2010 Policy.

Wescott argues that it reasonably expected the 2010 Policy to contain the same one-year discovery window as the 2004 and 2007 Policies. The change to the stricter discovery rules in the 2010 Policy, Wescott contends, "was never properly explained to Wescott and was simply included in the 2010 Policy which consisted of hundreds of pages." Resp. to Mot. Dismiss ¶ 8. For two reasons, this contention is insufficient to rewrite the 2010 Policy.

*i. 2008 Notice to Policyholders*

Cincinnati announced the change in discovery-based coverage in a 2008 "Notice to Policyholders." That notice stated, in part, that the discovery-based coverage rules were being restructured:

**2008 Notice to Policyholders**

**Crime and Fidelity Coverage**

> This is a summary of the major changes to the Crime and Fidelity Coverage Forms and related endorsements. . . .
>
> The crime and fidelity coverage has been restructured. . . . A third difference is between a discovery version of coverage versus a loss sustained version. The difference between discovery and loss sustained has to do with when coverage will apply and will not be discussed.

Am. Compl. Ex. C. Thus, two years before the change in policy language, Cincinnati announced the shift in discovery-based coverage.

Wescott alleges that it never received the 2008 notice. Even taking this contention as true, Wescott has not provided reason enough to reform the 2010 Policy to match its 2004 and 2007 predecessors, as discussed immediately below.

### ii. Pennsylvania Case Law

Pennsylvania case law on changes to insurance policies weighs against reforming the 2010 Policy.[1] As a general rule, "even the most clearly written exclusion will not bind the insured where the insurer or its agent has created in the insured a *reasonable expectation* of coverage." *Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 903 (3d Cir. 1997) (emphasis added); *cf.* Robert E. Keeton, *Insurance Law Rights at Variance with Policy Provisions*, 83 HARV. L. REV. 961, 967 (1970) ("The objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations.").

Two Pennsylvania Supreme Court cases stand as guideposts for determining whether an insured's expectation of coverage is objectively reasonable, even when it is contravened by the plain text of the insurance policy.

### a) *Standard Venetian Blind*

In the first case, an insured sought coverage under a policy containing two clauses that expressly excluded the insured's losses from coverage. *See Standard Venetian Blind Co. v. American Empire Ins. Co.*, 469 A.2d 563 (Pa. 1983). The exclusions were found in lines (n) and (o) of the policy's exclusions section. *Id.* at 565. The insured argued that it had not read or

---

[1] Wescott does not dwell on these cases, but the "reasonable expectations" rule is the only way Wescott could possibly achieve the outcome it seeks — namely, for the Court to read language from the 2004 and 2007 Policies into the 2010 Policy.

8

understood the exclusions. The court held that because the exclusions were "clearly worded and conspicuously displayed," the insured could not avoid their enforcement just by arguing that "he failed to read" or "did not understand" them. *Id.* at 567.

In this case, the discovery period could not be clearer: "Coverage . . . applies to loss . . . which is 'discovered' by you during the Policy Period" — not losses discovered up to one year after the policy period. And the Cincinnati discovery period was far more "conspicuously displayed" than lines (n) and (o) of an exclusions section at issue in *Standard Venetian Blind*: the discovery period here was paragraph A.1, *the very first paragraph*, of the "Commercial Crime Coverage Form." *See* Am. Compl. Ex. C, Ex. D.

b) *Tonkovic*

The second case refined the rule announced in *Standard Venetian Blind*. *See Tonkovic v. State Farm Mut. Auto. Ins. Co.*, 521 A.2d 920 (Pa. 1987). There, an insurer unilaterally limited the scope of insurance coverage, against the specific request of an insured. The court sided with the insured, holding that when an insured "applies and prepays for specific insurance coverage, the insurer may not unilaterally change the coverage provided without an affirmative showing that the insured was notified of, and understood, the change, regardless of whether the insured read the policy." *Id.* at 925.

Here, by contrast, Wescott has not alleged that it "specifically requested" the one-year discovery window when it purchased the 2010 Policy. *See id.* at 925. Nor can Wescott allege that it "*never received* a copy of the policy" before it went into effect. *See id.* at 924. Nor, finally, can Wescott allege that Cincinnati waited to unilaterally change the policy language until after Wescott had agreed to renew its insurance. To the contrary, Cincinnati notified its

customers of impending policy changes as early as 2008 — two years before Wescott renewed its policy.

* * *

In sum, Pennsylvania law recognizes a "crucial distinction" between two types of cases: (1) cases like *Standard Venetian Blind*, in which "the insured received precisely the coverage that he requested but failed to read the policy to discover clauses that are the usual incident of the coverage applied for"; and (2) cases like *Tonkovic*, in which "one applies for a specific type of coverage and the insurer unilaterally limits that coverage, resulting in a policy quite different from what the insured requested." *Tonkovic*, 521 A.2d at 925.

Because this case falls decidedly in the *Standard Venetian Blind* camp, the Court rejects Wescott's request that the Court rewrite discovery window in the 2010 Policy. Only the 2013 Policy provides coverage in this case.

## II. The entire theft was one "occurrence" under the 2013 Policy.

The Court finds three reasons why only one "occurrence" transpired under the 2013 Policy. First, as Wescott concedes, the plain meaning of "occurrence" found in the definition section of the "Commercial Crime Coverage Form" demonstrates that Wescott suffered only one occurrence. Second, Wescott's preferred definition of "occurrence," located in a special deductible endorsement, applies only to the endorsement itself. Finally, cases cited by Wescott are unpersuasive because they analyze insurance policies containing provisions different from those in the 2013 Policy.

### A. *The plain meaning of "occurrence" is undisputed.*

"Where the language of an insurance policy is clear and unambiguous, it must be given its plain and ordinary meaning." *12th Street Gym, Inc. v. General Star Indemn. Co.*, 93 F.3d

1158, 1165 (3d Cir. 1996). Here, the 2010 and 2013 Policies limit coverage to $100,000 per "occurrence" of employee theft, and define occurrence as follows:

**Commercial Crime Coverage Form (Discovery Form)**

. . .

    **F.    Definitions**

        . . .

        14.    "Occurrence" means:

          . . .

          (1) An individual act;
          (2) The combined total of all separate acts whether or not related; or
          (3) A series of acts whether or not related;

          committed by an "employee" acting alone or in collusion with other persons, during the Policy Period shown in the Declarations, before such Policy Period or both.

Am. Compl. Ex. C, Ex. D. This definition is unambiguous: Mr. Bryan's "series of acts" in stealing the copper wire qualify as a single "occurrence" because they were "committed" by a single employee — Mr. Bryan — both before and during the policy period. Even Wescott agrees that this definition "limit[s] the amount of coverage for all thefts occurring during the 2013 Policy period to $100,000." Mem. in Opposition to Mot. Dismiss, at 17.

    ***B. A separate definition of "occurrence" in a special deductible endorsement applies only to the endorsement itself.***

Wescott argues that the Court should apply a different definition of "occurrence" altogether. Wescott's preferred definition of "occurrence" comes in the policy's "Special Per Occurrence Deductible Endorsement," which reads:

11

**Special Per Occurrence Deductible Endorsement**

This endorsement modifies insurance provided under the following:

. . .

**Crime and Fidelity Coverage Part**

A. Special Per Occurrence Deductible

1. . . . [Changes the amount that Cincinnati will deduct per occurrence] . . .

2. *This endorsement does not apply* to any of the forms listed in Paragraphs a. and b.:

> a. . . . Commercial Crime Coverage Form, A. Insuring Agreements, 1. Employee Theft . . . .

B. Definition

*For the purpose of this endorsement only*, any definition of "occurrence" is deleted in its entirety and the following definition is added to:

. . .

3. Commercial Crime Coverage Form

. . .

"Occurrence" means all loss, damage, or a sequence of loss or damage, casualties or disasters arising from a single happening or event.

Am. Compl. Ex. D (emphases added).

Section A states that the endorsement does not apply to the Employee Theft section of the Commercial Crime Coverage Form — the very section under which Wescott filed a claim for Mr. Bryan's theft. Wescott argues that the exclusion in Section A.2 ("This endorsement does not apply to . . . Employee Theft") applies only to Section A (entitled "Special Per Occurrence

Deductible"), not to Section B (entitled "Definition"). But the plain text of Section A.2 states that the exclusion applies to the entire *endorsement*, not just one *section* of the endorsement.

To be sure, Section B states that the endorsement applies to (and alters) the definition section of the Commercial Crime Coverage Form, including the definition of "occurrence." But that alteration is made "[f]or the purpose of th[e] endorsement only" — that is, for the purpose of changing how Cincinnati calculates deductions and for no other purpose.

As a "Special Per Occurrence *Deductible* Endorsement," this document changes how Cincinnati calculates *deductions*, nothing more. It does nothing to alter — or render ambiguous — the definition of "occurrence" for any other purpose.

### C. *Wescott's case law is not on point.*

Wescott argues that several cases from other jurisdictions support its contention that there were multiple "occurrences" under the 2013 Policy.[2]

For two reasons, these cases are not on point. First, none involved the "Special Per Occurrence Deductible Endorsement" analyzed here. Second, and more fundamentally, these cases all analyzed a dense thicket of relation-back provisions in their insurance policies. The 2004 and 2007 Policies in this case contain some of these provisions, including provisions for

---

[2] *See, e.g.*, *Karen Kane, Inc. v. Reliance Ins. Co.*, 202 F.3d 1180, 1185 (9th Cir. 2000); *Spartan Iron & Metal Corp. v. Liberty Ins. Corp.*, 6 Fed. App'x 176 (4th Cir. 2001); *Glaser v. Hartford Cas. Ins. Co.*, 364 F. Supp. 2d 529 (D. Md. 2005); *Basler Turbo Conversions, LLC v. HCC Ins. Co.*, 601 F. Supp. 2d 1082 (E.D. Wis. 2009); *Dataflow, Inc. v. Peerless Ins. Co.*, No. 11-CV-1127, 2014 WL 4881534 (N.D.N.Y. Sept. 30, 2014); *ABS Clothing Collection, Inc. v. Home Ins. Co.*, 41 Cal. Rptr. 2d 166 (Cal. Ct. App. 1995); *E.J. Zeller, Inc. v. Auto Owners Ins. Co.*, 2014 OH 4994, 2014 WL 5803028 (Ohio Ct. App. 2014); *First United Methodist Church of Stillwater, Inc. v. Phila. Indemn. Ins. Co.*, 2016 OK 59, 2016 WL 5724860 (Okla. Ct. Civ. App. 2016).

"Loss Sustained During Prior Insurance,"[3] "Loss Covered Under This Insurance and Prior Insurance Issued by Us or Any Affiliate,"[4] and "Non-Cumulation of Limit of Insurance."[5]

But the 2010 and 2013 Policies do not include these relation-back provisions, and Wescott has not argued that these policies should be reformed to include them. Because the cases cited by Wescott do not respond to the questions posed by the unique set of policy provisions in the 2010 and 2013 Policies, they do not change the answers.

---

[3]     8. Loss Sustained During Prior Insurance

    a. If you, or any predecessor in interest, sustained loss during the period of any prior insurance that you or the predecessor in interest could have recovered under that insurance except that the time within which to discover loss had expired, we will pay for it under this insurance, provided:

        (1) This insurance became effective at the time of cancellation or termination of the prior insurance; and
        (2) The loss would have been covered by this insurance had it been in effect when the acts or events causing the loss were committed or occurred:

    b. The insurance under this Condition is part of, not in addition to, the Limits of Insurance applying to this insurance and is limited to the lesser of the amount recoverable under:

        (1) This insurance as of its effective date; and
        (2) The prior insurance had it remained in effect.

[4]     9. Loss Covered Under This Insurance and Prior Insurance Issued by Us or Any Affiliate: If any loss is covered:

    a. Partly by this insurance; and

    b. Partly by any prior cancelled or terminated insurance that we or any affiliate had issued to you or any predecessor in interest;

    The most we will pay is the larger of the amount recoverable under this insurance or the prior insurance.

[5]     10. Non-Cumulation of Limit of Insurance: Regardless of the number of years this insurance remains in force or the number of premiums paid, no Limit of Insurance cumulates from year to year or period to period.

## CONCLUSION

For the foregoing reasons, Cincinnati's motion to dismiss is granted. An appropriate order follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE